M. Henry Martusoello, J.
The defendant City of New York moves pursuant to section 749-aa of the Judiciary Law for an order directing that the issues raised in this action, brought to recover damages for wrongful death, be tried by a special jury.
Plaintiff’s intestate, Arnold L. Schuster, while approaching his home in Brooklyn, was shot and killed by an unknown assassin on March 8, 1952. Just 19 days before his death Schuster had supplied information to the Police Department of the City of New York which led to the apprehension and arrest of a notorious criminal and fugitive from justice known as Willie Sutton. Schuster’s role in the capture of Sutton was widely publicized and almost immediately, and from time to time thereafter, Schuster received numerous anonymous communications threatening his life, of which he notified the police.
Plaintiff claims that Schuster was killed in consequence of his supplying information about Sutton to the police; and he accordingly draws his complaint on the theory that the information supplied was in aid of law enforcement and thus begot *671 threats to Schuster’s life, causing him to notify the Police Department thereof and to demand protection for his person; and that under the circumstances the City of New York owed to Schuster the special duty of providing the police protection sought. It is alleged in the complaint that the city violated such special duty owed by failing to exercise reasonable care in supplying Schuster with police protection upon demand: and that Schuster’s death was due to the negligence of the city in recklessly exposing him to danger, in advising him that threats upon his life were not seriously made, in failing to supply him with a bodyguard and in heedlessly imparting to him a false impression of safety and lack of danger.
Section 749-aa of the Judiciary Law, insofar as it is applicable to the instant motion, provides as follows:
‘ ‘ 1. List of special jurors. The county clerk of each county of the state having a population of one million or more inhabitants, according to the last preceding federal census; shall select from the persons qualified to serve as trial jurors in such county such number of special jurors as the justices of the appellate division of the supreme court, * * * shall, from time to time direct. * * *
‘ ‘ 4. Application for special jury. Whenever an issue of fact has arisen in any civil or criminal action triable in a county embraced within the provisions of this section, the district attorney, or the defendant, if in a criminal action, or either party in a civil action may apply for a special jury to try such issue. * * * Where, upon such application, it appears to the court that by reason of the importance or intricacy of the case, a special jury is required, or that the subject-matter of the indictment or the issue to be tried has been so widely commented upon that the court is satisfied that an ordinary jury cannot without delay and difficulty be obtained to try such issue, or that for any other reason the due, efficient and impartial administration of justice in the particular case would be advanced by the trial of such an issue by a special jury, the court to which the motion is made may make an order directing that such trial be had by a special jury, and such trial shall be had accordingly”. (Italics supplied.)
The defendant, in substance, urges the following grounds in support of its application for a special jury:
(1) The issues of the case relate to matters which affect and involve the public interest by reason of the “ charge-filed ” allegations of negligence, fraudulent misrepresentations, etc., contained in the complaint, reflecting upon the official conduct of the members of the Police Department of this city; and that *672 the case is accordingly important within the meaning of the above-quoted statutory provision.
(2) The facts and issues in the ease have been so widely commented upon through the media of newspapers, legal publications, television and radio, and by the public generally, that an ordinary jury cannot without delay and difficulty be obtained to try such issues.
(3) That the trial will be protracted and will take about four weeks, and that the petit jurors in Kings County are reluctant to serve more than the ‘ ‘ accustomed and required ’ ’ two weeks of service.
The above-quoted statutory provision authorizing a trial by a special jury was enacted in 1901. It has been frequently utilized in criminal actions but seldom in civil cases. A diligent research reveals that there have been only six reported applications for a special jury in a civil action in the past 59 years.
The first of such applications was made in 1905 in Industrial & Gen. Trust v. Tod (46 Misc. 492). The plaintiff there sought to recover the value of certain railroad bonds owned by it and rendered worthless by acts committed by defendants in their endeavor to reorganize the railroad property upon which said bonds were a charge. Apparently the only question to be determined was the value of the bonds. As said bonds had had no market value for some years, it had been held that the value thereof was to be fixed in such an amount as would be in proper proportion to the estimated value of the railroad as a going concern as of the time the afore-mentioned acts were committed (Industrial & Gen. Trust v. Tod, 180 N. Y. 215). The defendants made application for a trial by a special jury and same was granted on the ground that the issue presented should be determined by a jury equipped with practical business experience and that each juror, to grasp the facts and make a fairly intelligent estimate of the values involved, should have much of the capacity for financial analysis which a successful reorganizer of railroad properties might be deemed to possess. The order entered on that determination was affirmed on appeal with one Judge dissenting (103 App. Div. 596).
In 1908 the Appellate Division of the First Department ordered a trial by a special jury in a libel action brought by the District Attorney of New York County (Jerome v. New York Evening Journal Pub. Co., 124 App. Div. 372). The defendant had published that the plaintiff had knowingly neglected his duty as District Attorney to prosecute certain corporations and wealthy individuals who were guilty of violating penal statutes,- and that he was influenced to refrain from such *673 prosecution by the fact that they had made large contributions to a campaign fund used in the furtherance of his election as District Attorney. As was indicated in its decision, the court followed an established rule of early days to order a trial by a struck jury in actions where a public official was libeled in respect to his official conduct, because of the public’s interest in such actions. A struck jury, which was different from a special jury and was abolished in 1937, derived its name from the manner in which it was selected. The county clerk would select from the general jury list the names of 48 persons whom he deemed most indifferent between the parties and best qualified to try the case. The parties then alternately would each strike off 12 names from the list thus prepared and the remaining 24 names constituted the panel from which the trial jurors would be picked.
Later in 1908 the afore-mentioned Appellate Division ordered a trial by a special jury in People v. McClellan (124 App. Div. 664), which was an action in quo warranto to test the validity of the election of the defendant as Mayor of the City of New York, holding that the question presented therein was of grave importance to the public.
Then in 1909 the Appellate Division of this department ordered a special jury in Coler v. Brooklyn Daily Eagle (133 App. Div. 300), which was a libel action brought by the Borough President of the Borough of Brooklyn to recover damages for the publication by the defendant that said plaintiff was interested in street paving contracts in violation of the City Charter. It would seem from the opinion therein that some, if not all, of the Judges of that court did not favor the practice of ordering a special jury in a civil action, but were following the rule laid down in the Jerome case (supra) to avoid having conflicting rules prevail in this city as to special jury trials in libel actions brought by public officials.
Surrogate Foley in 1922 ordered a special jury to try a contested probate proceeding because of the intricacy and history thereof (Matter of Eno, 118 Misc. 431, affd. 202 App. Div. 739). There had been two previous trials of that contest and both resulted in verdicts against the will in question, which were set aside as being against the weight of the evidence. The intricacy of that proceeding is revealed in the opinion of Surrogate Foley setting aside the last verdict. (118 Misc. 186.) It appears that the record of the last trial was voluminous and contained 5,000 pages of testimony given by 135 witnesses and dealing with the life, conduct, habits and declarations of the testator. The only issue to be-decided by the jury was whether the testator had *674 testamentary capacity. Yet, some of the aforesaid testimony, introduced by the contestants under the guise that it bore on said issue, tended to show that- the will had been induced by fraud and duress. Although the jury had been repeatedly instructed throughout the trial and in the court’s charge that it was to determine solely the capacity of the testator to make a will and not to consider any evidence tending to show fraud or undue influence, Surrogate Foley nevertheless felt certain that the jury’s verdict against the will was materially influenced and affected by the aforesaid extraneous evidence, due in great part to the technical rules of evidence and the difficulty of analyzing the complicated mass of facts on that trial.
The last reported application for a special jury in a civil matter was made and granted in 1935 in an involved probate contest which had gone to trial and had resulted in the failure of the jury to agree upon a verdict. (Matter of Lippman, 154 Misc. 915, affd. 245 App. Div. 807.)
Relying on the foregoing cases as authority therefor, the defendant contends that it is entitled to the relief sought simply upon the substantiation of any of the grounds alleged in support of its motion. It seems to me, in view of the history and purpose of special juries, that the question to be decided here is not as narrow as is seemingly indicated by that contention, but involves as well a finding that the existence of the alleged grounds genuinely require a trial by a special jury. To state it differently, the real crux of this motion is whether an ordinary jury in this county is as competent and as well qualified as a special jury to sit in judgment as impartial judges of the facts herein, even though same may have been widely publicized or may be of interest to the public or may be intricate or may take many weeks to try.
Special juries were known to the common law and were resorted to in cases which were of too great a nicety for the discussion of an ordinary jury (3 Blackstone’s Comm., p. 357 [12th ed.]). In Rex v. Edmonds (4 Barn. & Aid. 471), which was a criminal case tried before a special jury, it was observed that the practice of appointing special juries for trials was of ancient origin and had been introduced for the better administration of justice and for securing the nomination of jurors duly qualified in all respects for their important office.
Special juries, however, were not authorized in this State until the enactment of chapter 378 of the Laws of 1896 which provided for the use thereof only in a criminal action in a county having a population of more than 500,000. Said act authorized either the District Attorney or the defendant to apply for *675 a special jury to try an issue of fact where it appeared “ that a fair and impartial trial of such issue cannot be had without a special jury, or that the importance or intricacy of the case requires such jury, or that the subject matter of the indictment has been so widely disseminated or commented upon by the press or otherwise as to induce the belief that an ordinary jury can not, without delay and difficulty, be obtained to try such issue, or that for any other reason the due, efficient and impartial administration of justice in the particular case requires that the trial of such issue be had by special jury A special jury when ordered was to be drawn from a special list prepared and kept by a special jury commissioner. Said commissioner selected for that list those persons who were qualified to serve as ordinary jurors, and whom he deemed qualified, after a personal examination, to serve as special jurors. He, however, was restricted in his selection of special jurors to the extent indicated in section 8 of said act which read as follows: ‘ ‘ The special jury commissioner shall not select as a special juror any person who is by law disqualified or exempt from service as a trial juror; nor shall he select any person who has been convicted of a criminal offense, or found guilty of fraud or other misconduct by the judgment of any civil court; nor any person who possesses such conscientious opinions with regard to the death penalty as would preclude his finding a defendant guilty if the crime charged be punishable with death; nor any person who doubts his ability to lay aside opinions or impressions formed from newspaper reading or hearsay, and to render an impartial verdict upon evidence, uninfluenced by any such opinions or impressions; nor any person who possesses such opinions as would prevent his finding a verdict of guilty in any case upon circumstantial evidence; nor any person who avows such a prejudice against any law of the state as would preclude his finding a defendant guilty of violating such law; nor any person who avows such a prejudice against any particular defense to a criminal charge as would prevent his giving a fair and impartial trial upon the merits of such defense; nor any person who avows that he cannot in all cases give to a defendant who fails to testify as a witness in his own behalf the full benefit of the statutory provision that his neglect or refusal to so testify as a witness in his own behalf does not create any presumption against him.”
Special juries, on the other hand, were not established in civil actions until the enactment of chapter 602 of the Laws of 1901. That act authorized a special jury when ordered in a civil or criminal action triable in a county having a population of one *676 million or more; and section 3 thereof imposed the above-quoted restrictions as the only controls in the selection of special jurors for either of said actions.
For a significant reason hereafter becoming apparent, it is necessary at this time to evaluate the effectiveness of these restrictions in fulfilling the historic purpose for which the special jury was introduced to common law, namely, to provide more intelligent and competent jurors in exceptional cases.
The only counties in 1901 having a population of 1,000,000 or more were New York and Kings. The qualifications then prescribed for ordinary jurors in those counties were the same and were set forth in sections 1079 and 1126, respectively, of the Code of Civil Procedure. To qualify as an ordinary juror a person had to be: (1) a citizen of the United States and a resident of the county; (2) not less than 21 nor more than 70 years of age; (3) owner of property of the value of $250; (4) in possession of his natural faculties and not infirm or decrepit; and (5) free from all legal exceptions; intelligent; of sound mind and of good character; and able to read and write the English language understandingly.
The special jury restrictions, it would seem, did not fail of their purpose in criminal actions. They exacted qualifications not otherwise required of ordinary jurors, which bespoke a level of intelligence and competence adequate to satisfy the critical needs of any criminal action, especially a murder case.
The latter qualifications, however, were not originally designed to meet the needs of every civil action. Accordingly, they did not necessarily mark special jurors as better qualified therefor than ordinary jurors. The conditions thereof were in some respects peculiar to a criminal action only and in other respects were not likely to become important in every civil action.
Thus, one’s views on capital punishment would have no legitimate bearing on fitness for jury service in any civil action. Yet, a person eminently qualified therefor would be barred from becoming a special juror if he were opposed to such punishment. The fact that special jurors were found not to be prejudiced against a criminal defense or against a defendant charged with a crime who did not testify in his own behalf did not necessarily mean that they were free of all prejudices as to matters arising in a civil action, particularly since they were not specifically examined relative thereto.
The ability to lay aside impressions resulting from publicity given to a case or to accept circumstantial evidence was not likely to be of importance in every civil action. But if those *677 matters did become so therein, then they could have been effectively explored by a voir dire examination revealing precisely the matters in question, which would have produced far better results than a general examination conducted by the Commissioner of Jurors without reference to any actual case in point.
Therefore, in my opinion, the only material and practical accomplishment of these restrictions, so far as fitness in any civil action was concerned, was the securing of jurors who were never convicted of any criminal offense, a condition not required of ordinary jurors. The deficiency in that respect was eventually remedied, as will be later shown herein.
The foregoing restrictions have been continued in effect without any changes in the wording thereof and still control the section of special juries ( Judiciary Law, § 749-aa, subd. 2). There were, however, changes made in the Special Jury Law which affected its applicability and are of interest herein. That law was amended by the enactment of chapter 112 of the Laws of 1920, which authorized special juries also in a civil or criminal action triable in each county of the State having a population of 400,000 or more, adjoining a county having a population of one million or more inhabitants. Since New York and Kings Counties had special juries since 1901, this legislative act included Bronx and Queens Counties. Westchester and Nassau were later affected thereby when their population exceeded 400,000. In 1941, however, the Legislature abolished special juries in Westchester and Nassau (L. 1941, ch. 402).
As the law now stands, it applies only to four counties in this State, namely, Bronx, New York, Kings and Queens. Since the other county in this city, Richmond, is not affected thereby, the defendant would have had no right to make this application if this action were triable therein. Or, if this action were pending in any county outside of New York City, it would have to be tried by an ordinary jury, no matter how exceptional a case it might be.
The qualifications for ordinary jurors throughout this State are substantially the same. (Judiciary Law, §§ 504, 596, 662.) Nevertheless we have a law that indicates skepticism as to the fitness of ordinary juries in four counties of this city to try exceptional cases and on the other hand reposes implicit confidence in ordinary juries elsewhere to deal effectively with such cases. Why such an incongruous situation should exist is for the Legislature to say. But whether such skepticism is in fact justified with respect to ordinary juries in this county, however, is a matter that materially affects the discretion to be exercised on this application.
*678 The statute authorizing special juries has been upheld by the United States Supreme Court by 5-4 decisions in two criminal cases as not being violative of the due process clause of the Federal Constitution. (Fay v. New York, 332 U. S. 261; Moore v. New York, 333 U. S. 565.) Mr. Justice Murphy, in his dissenting opinions in both cases, strongly condemned special juries as being un-American and undemocratic. Some of his comments therein bear repeating here to serve no other purpose than to point up the delicacy of the question under consideration.
Thus, in the Fay case, he observed (pp. 299-300): “ There is no constitutional right to a jury drawn from a group of uneducated and unintelligent persons. Nor is there any right to a jury chosen solely from those at the lower end of the economic and social scale. But there is a constitutional right to a jury drawn from a group which represents a cross-section of the community. And a cross-section of the community includes persons with varying degrees of training and intelligence and with varying economic and social positions. Under our Constitution, the jury is not to be made the representative of the most intelligent, the most wealthy or the most successful, nor of the least intelligent, the least wealthy or the least successful. It is a democratic institution representative of all qualified classes of people. * * * We can never measure accurately the prejudice that results from the exclusion of certain types of qualified people from a jury panel. Such prejudice is so subtle, so intangible, that it escapes the ordinary methods of proof. It may be absent in one case and present in another; it may gradually and silently erode the jury system before it becomes evident.”
And, in the Moore case (supra) he stated, at page 570:
‘ ‘ The vice lies in the very concept of 1 blue ribbon ’ panels — the systematic and intentional exclusion of all but the ‘ best ’ or the most learned or intelligent of the general jurors. Such panels are completely at war with the democratic theory of our jury system, a theory formulated out of the experience of generations. One is constitutionally entitled to be judged by a fair sampling of all one’s neighbors who are qualified, not merely those with superior intelligence or learning. Jury panels are supposed to be representative of all qualified classes. Within those classes, of course, are persons with varying degrees of intelligence, wealth, education, ability and experience. But it is from that welter of qualified individuals, who meet specified mirnrmrm standards, that juries are to be chosen. Any method that permits only the ‘ best ’ of these to be selected opens the *679 way to grave abuses. The jury is then in danger of losing its democratic flavor and becoming the instrument of the select few.
“ Hence, the ‘ blue ribbon ’ method of selecting only the ‘ best ’ of the general jurors, a method instituted with the highest of intentions, does violence to the fundamental precepts of the jury system. ’ ’
Views of a similar vein had also been expressed by the Judicial Council of this State, which functioned until 1955 when it was succeeded by the Judicial Conference. The council which consisted of the Chief Judge of the Court of Appeals, the Presiding Justices of the four Appellate Divisions, ranking members of the Legislature, and leading members of the Bar appointed by the Governor, was under the duty of continuous study of the practices and procedures of the courts and of making recommendations for improvements to the Legislature.
In its Third Annual Report (1937, pp. 123-128) the council recommended abolition of struck juries, foreign juries, and special juries. It said (p. 127) that “ A well-administered ordinary jury system should produce jurors of as high calibre for every action as the special jury system attempts to provide in exceptional cases.” The recommendation was followed by the Legislature except as to special juries.
In its Fourth Annual Report (1938, pp. 46-47) the Judicial Council renewed its recommendation as to special juries, stating that, “ The Judicial Council believes that every petit jury shall be of uniformly high calibre and capable of giving a fair trial in all cases. To attain this goal, the ordinary jury, as now provided, may be in need of improvement. It is, however, unjust and it should be unnecessary to select supposedly special juries in specific cases.”
And in its Fifth Annual Report (1939, p. 42) the council once more renewed its aforesaid recommendation, pointing out that the legal requisites prescribed for special jurors and ordinary jurors were substantially the same, and that “ In consequence, as might have been expected, such a special juror inevitably feels superior and such a special jury system becomes distinctly un-American and not consonant with a trial by one’s peers.” And it further reported therein that if the quality of jurors serving on the general jury in the four counties of this city had not in the past been adequate, then that defect was one not so much of law as of the administration or application of the law.
Accordingly, in its Sixth Annual Report (1940, pp. 195, 197) the council recommended a general revision of the jury system in New York City by the enactment of statutes proposed by it, *680 which were designed to provide jurors of high calibre and character and to increase the efficiency of the administration of the jury system in this city. While it did not then recommend abolition of special juries, it did indicate that it was not withdrawing from its former position relative thereto. In that year, however, Hon. Herbert H. Lehman, then Governor, recommended in his message to the Legislature that special juries be abolished, stating: “ A precious possession of democracy is the right to a fair trial. Like the right of free speech, press, assembly and religion, care must be taken lest through design or inadvertence its vitality be diminished, * * * [Ijndispensable to a fair trial * * * is an impartial jury of peers. * * * [D]emocracy will have lost much of its dynamic quality if scrupulous respect is not paid to the constitutional right of a trial by a jury of peers. The practice of using special or so-called blue ribbon juries is not consonant with the preservation of this right. * * * It is not necessary to resort to the use of a blue ribbon jury in order to obtain capable jurors. On the contrary, a fair trial requires that all groups of a community find particular representation on the jury list. To restrict a jury list to particular citizens is a practice which * * * tends to destroy the democratic administration of justice. If the method of jury selection is in need of improvement, it is a problem of administration. It is not adequately or permanently solved by compromising, through a blue ribbon jury, the citizen’s right to be tried by a jury of his peers. * * * Therefore, I recommend that the blue ribbon juries be abolished.” (Public Papers of Governor Lehman, 1940, pp. 15-16; italics supplied.) His recommendation went unheeded. But the Legislature enacted statutes as proposed by the council, and same became effective September 1,1940 and now constitute article 17 of the Judiciary Law.
The Legislature thereby effected major changes in the Judiciary Law which increased the efficiency of the administration of said jury system and improved the quality of jurors.
Thus, section 592 of that law requires the Justices of the Appellate Divisions in this city to make rules regulating the manner and practice of examining and selecting jurors. This provision was new and was assimilated to the provision in section 749-aa of the Judiciary Law which likewise requires said Justices to make rules governing the selection of special jurors.
Section 595 thereof provides that no persons named shall be entered on a jury list unless (a) he has been personally interviewed by the county clerk; (b) he has stated his qualification under oath; (c) his name has been forwarded to the Police *681 Department for checking against the records of that department and a report received or a reasonable time has elapsed without such report. These provisions are similar to those found in article 18-B of the Judiciary Law governing special jurors. The close scrutiny thus required of jurors serves to eliminate undesirable characters from juries and otherwise to provide trial jurors of uniformly high calibre.
Section 596 of that law, which prescribes the qualifications of ordinary jurors in this city, by subdivision 5 thereof, imposes, in addition to the old requirements, the requisite that a person must not have been convicted of a felony or a misdemeanor involving moral turpitude. This subdivision was adapted from subdivision 2 of section 749-aa of the Judiciary Law, which specifies the qualifications of special jurors, and was inserted in accordance with the council’s goal of requiring all jurors to be of uniformly high calibre. And thus was remedied the previously existing deficiency in qualifications of ordinary jurors, which, as was hereinbefore mentioned, marked their difference from special jurors.
In its Eighth Annual Report (1942, p. 40) the council renewed its recommendation to have special juries abolished, stating: “ The Judicial Council has been advised by the four county clerks of the counties concerned that all jurors now serving and available for service have been qualified and examined under the new system. The Council has further been informed by the county clerks, as well as by others in a position to know, that the calibre of general jurors has greatly improved since the establishment of the new system.” And in its Eleventh Annual Report (1945, pp. 49-50) the council proposed that special juries “ be abolished as unnecessary and undesirable ”, in the Counties of Bronx, New York, Kings and Queens. It said, “ It is undisputed that the revised jury system for New York City recommended by the Judicial Council and in operation since 1940 has succeeded in improving the quality of jurors generally by applying to all jurors the high standards which formerly were required only of special jurors. Thus, the necessity for special jurors no longer exists.”
' The last recommendation for the abolition of special juries was made in the Eighteenth Annual Report of the council (1952, pp. 157-158). It was pointed out therein that the improvement in the quality of jurors had been accomplished by applying to all jurors the standards which formerly were required only of special jurors, with the result that the general panel represented a true cross section of the community. The council also reported that it had conducted a survey of the special jury system and *682 made the following findings: (1) The special jury is no longer needed because the general jury system is producing a fair cross section of the community capable of determining any case. (2) There are no objective statutory qualifications by which the selection of special jurors may be differentiated from those selected for the general jury panel; (3) The special jury panel is a less fair cross section of the community than the jury panel because of greater imbalances as to: (a) occupation, there being a disproportionate weighting in favor of 1 ‘ business ’ ’ people as opposed to “working” people; (b) educational qualifications; (c) sex, there being a smaller proportion of women to men on a special jury panel than on the general jury panel.
The above-cited civil actions wherein special juries were ordered and which are relied upon by the defendant, may serve as examples of important or intricate litigation, but it seems to me that otherwise their effectiveness as authorities controlling the disposition of this motion has been dulled by the findings of the Judicial Council that ordinary jurors selected under the jury system here are of a higher caliber than those selected prior to 1940.
When those cases were decided, undoubtedly the quality of jurors serving on ordinary juries was not adequate for exceptional cases. Such defect, however, as was pointed out by the Judicial Council, was due not so much to the law itself, but to the failure to so administer the jury system as to provide intelligent and capable jurors. The problem thus presented had to be remedied; but the solution thereof lay in the taking of measures designed to improve the administration of the jury system, and not in compromising the right of a citizen to a trial by a jury of his peers as was done by the institution of the special or blue ribbon juries. The dilemma resulting therefrom was recognized by the council. Accordingly, it directed its efforts to and succeeded in obtaining legislation not only improving the administration of the jury system but also the quality of the jurors. As the council reported, and as my own experience confirms, that legislation has resulted in securing jurors in this city who are intelligent and capable enough to try exceptional cases. And when the city claims otherwise, as it does on this application, it overlooks the fact that many exceptional cases to which it was a party and which were as intricate and important as the instant action, if not more so, were competently tried by such jurors, and in many instances resulted in verdicts in its favor.
Ironically, the jury system in this city, which is indirectly assailed on this application as being inadequate to produce capable jurors, served as the model for the completely revised jury *683 system which went into effect in up-State counties upon the enactment of chapter 305 of the Laws of 1954. Governor Thomas E. Dewey, in recommending in his message to the Legislature the need for such revision, pointed out the efficiency of the jury system in this city, saying: “In 1940 there was established for the City of New York a uniform jury selection system which has been most successful. It has fostered competence and impartiality and avoided those miscarriages of justice which may result from a small hand-picked group of professional jurors.” (Public Papers of Governor Dewey, 1954, p. 13.) And in his memorandum approving the last-mentioned legislative act he had occasion to say: “A substantially similar system has been in effect in the City of New York since 1940. It has simplified the administration of the jury system in that city and provided jurors of high calibre.” (Ibid, p. 269.)
It is my opinion, based upon my own experience and upon the findings of the Judicial Council, as reported above, that ordinary jurors in this county possess the requisite qualifications to try the issues in this case and that there is no need for a special jury herein.
Moreover, the defendant has failed to substantiate any of the grounds alleged in support of its motion. This case does not involve official corruption which would affect the public at large. The complaint charges a breach of duty to an individual with consequent damage to the individual and not to the public generally. It is, therefore, important only to the immediate parties (cf. Adams v. Morgan, 67 Hun 649, opinion in 21 N. Y. S. 1057). The fact that other municipalities are interested in the outcome of this case does not make it important (cf. Hartshorn v. Gelston, 3 Caines 84). The claim that the action is intricate by reason of divergent opinions rendered in the history of this case relative to the sufficiency of the complaint is without merit. Whatever intricacy may have existed, was dissolved by the rule enunciated by the majority opinion in the Court of Appeals (5 N Y 2d 75). The rule laid down by that court was that the public owes a special duty to use reasonable care for the protection of persons who have collaborated with it in the arrest and prosecution of criminals, once it reasonably appears that they are in danger due to their collaboration. It is no more intricate than other rules of negligence applied daily in our courts; and an ordinary jury should encounter no difficulty in applying it to the facts in this case.
It cannot be disputed that the events and issues relating to this case have received widespread publicity. But that fact in and of itself does not make the case one of importance within *684 the meaning of the statute (People v. Stemmer, 55 N. Y. S. 2d 160). The defendant has not shown how that publicity would unduly delay or seriously hamper the selection of an ordinary jury. Nor do I perceive how by virtue of that publicity any greater difficulty would be encountered in the selection of such a jury than in the selection of a special jury.
The final contention that the trial of this action will be protracted and that ordinary juries will be reluctant to serve during the period thereof is sheer conjecture without any facts to support it. Protracted trials in this county are not uncommon, and if defendant’s contention were to be upheld it would be necessary to require a special jury for every protracted trial.
Juries were intended to serve as instruments of justice. They cannot fulfill that purpose unless they are truly representative of the community. There can be no true equal representation of a community if jurors are selected because of an alleged economic, social or superior educational status. Responsibility in our democracy should be shared by all and not a few; and this responsibility extends to passing upon important and serious questions that arise in our courts of justice.
Juries of character, courage and independence can only exist in an atmosphere where there is no discrimination in their choice because of social, economic or philosophic reasons. There is no justification today for a jury system which divides citizens into special or blue ribbon jurors and ordinary or general jurors. Such discrimination short-circuits our democratic processes and there is no valid reason why it should continue until the end of time. Motion denied. Submit order.